UNITED STATE BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| In re: Settlers' Housing Service, Inc., Debtor. | Bankruptcy No. 13-28022 Chapter 11 |
|---|---|

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON SCHAUMBURG BANK'S MOTION TO LIFT THE AUTOMATIC STAY

Debtor, Settlers' Housing Service Inc. ("Settlers'"), filed for bankruptcy relief under chapter 11 of the Bankruptcy Code. Creditor, Schaumburg Bank and Trust Co. ("Schaumburg Bank" or "the Bank"), moved for relief from the automatic stay under § 362(d), asserting (1) lack of adequate protection of its interest in certain property of Settlers', and (2) that Debtor has no equity in the property and it is not necessary to an effective reorganization because there is no prospect of an effective reorganization. Debtor was ordered to file and it did file a proposed Plan.

Trial was held and the parties rested on the Bank's stay motion. Oral closing argument was heard, and the parties were invited to file supplemental briefs on the effect of Schaumburg Bank's § 1111(b)(2) election.

For reasons stated below, it is found and held that (1) presently there is no prospect of an effective reorganization because evidence shows that Debtor has inadequate cashflow to support a feasible plan of reorganization if the Bank's filed claim is found to be valid, but (2) Debtor may have a feasible plan if it prevails in its objection and counterclaim to the Bank's proof of claim, and (3) the Bank does not presently lack adequate protection. The stay will remain in effect until the claim objection and counterclaims are decided.

The Court now makes and enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

Debtor is a non-profit organization under Illinois law that seeks to provide low-cost housing to refugees with resident alien status in the United States. Debtor was originally organized in 1992 by KJ Lodico and Joe Lodico, who were married at the time. Settlers' acquired its properties through grants provided directly or indirectly through the Department for Housing and Urban Development ("HUD"). Debtor's mission included acclimating recently arrived immigrants to American life, including provision to its

residents of training in how to own and care for property. Many of the properties originally acquired from HUD were rented to and eventually sold to the residents, with proceeds from the sales funding further work by Debtor. KJ Lodico, executive director of Settlers' testified without contradiction that prior to the July 2008 acquisition of property from Bank of Commerce, Debtor was always able to meet its financial obligations.

In July, 2008, Debtor owned five properties in DuPage County ("the DuPage County Properties") and a thirteen-unit property in Oak Park ("the Washington Taylor Property"). In July, 2008, Setters' acquired additional property ("the Faulkner Properties") through the Bank of Commerce in exchange for assuming a $3.4 million loan. Debtor alleges that its acquisition of the Faulkner Properties was accomplished through a fraudulent scheme by the Bank of Commerce. Further, Debtor executed a line of credit agreement with Bank of Commerce which cross-collateralized the Washington Taylor Property and the Faulkner properties, another transaction which Debtor alleges was fraudulent. Altogether, forty-nine rental units owned by Setters' are encumbered by mortgages that were executed in favor of the Bank of Commerce ("the Bank of Commerce Properties").

In 2011, Schaumburg Bank acquired the Bank of Commerce from an FDIC receivership. In 2012, the Bank foreclosed on the Bank of Commerce Properties. In the state court foreclosure proceedings, Stephen H. Baer was named receiver for the properties. Debtor filed an answer together with counterclaims and third-party claims against individuals associated with Bank of Commerce, asserting an allegedly fraudulent scheme whereby Bank of Commerce sold Debtor the Faulkner properties and obtained a mortgage on the Washington-Taylor Property.

On July 12, 2013, Debtor filed the above entitled case for relief under chapter 11 of the Bankruptcy Code. The Bank filed its Proof of Claim (as subsequently amended) for $5,103,3225.97[1], assertedly secured by mortgages on property worth $2,721,000. The parties have stipulated for purposes of the stay relief motion that the properties are worth the latter amount.

On August 27, 2013, the Bank moved for relief from the automatic stay under §§ 362(d)(1) and 362(d)(2), alleging lack of adequate protection and lack of equity and the lack of necessity for a viable plan of reorganization, and also a motion for the receiver

[1] The $5.1 million figure includes post-petition interest and fees. Since the Bank is undersecured, this figure will have to be amended to exclude post-petition charges. However, the conclusion in this opinion would not be materially changed by a slightly smaller Bank claim.

appointed in the state court case to retain possession of the real estate. By agreement of the parties, the receiver was ordered to be retained until resolution of the stay motion. (Docket 70.)

The court *sua sponte* ordered the debtor to file a proposed plan and disclosure statement by October 21, 2013. The motion for relief from the automatic stay was then set for trial. The issue considered was primarily whether Debtor's proposed plan is economically feasible.

At present, only ten of the forty-nine Bank of Commerce Properties are occupied and paying rent. Since the parties have stipulated that the properties are worth $2,721,000, Debtor does not have equity in the property within the meaning of 11 U.S.C. § 362(d)(2)(A).

Debtor's Plan and Disclosure Statement propose to regain possession of the properties and through effective management ramp up the occupancy level to 90% or greater within six to twelve months. Under the proposed plan, since the Bank has made a § 1111(b) election (Docket 85), the Plan proposes to give the Bank a note for the entirety of its allowed claim at 5% interest, with monthly payments of $12,000 for thirty years, followed by a balloon payment. The disclosure statement argues that the proposed payment amount is feasible because Debtor can generate over $260,000 per year in rents net of operation expenses, which is said to be enough to cover $144,000 per year in payments to the Bank. KJ Lodico testified that Settlers will be able to achieve even greater than 90% occupancy because it has a history of achieving such high occupancy rates on account of its contacts with recent immigrants seeking homes, and will continue to have that ability. Indeed, KJ Lodico testified that she is confident that a 90% or greater occupancy rate could be achieved within three to six months after Settlers' Housing recovers control of the mortgaged properties. Independent evidence showed that there is a heavy demand for similar rentals in the area.

In order to challenge feasibility, the Bank introduced the expert testimony of William Haegele, a Certified Public Accountant, and Certified Insolvency and Restructuring Advisor, who performed an analysis of Debtor's Plan and Disclosure Statement. Haegele testified that the Disclosure Statement lacked enough financial information for a creditor to evaluate the plan. For example, the Disclosure Statement does not contain an analysis or projection of the first twelve months following a Plan confirmation during which Debtor would ramp up occupancy, and therefore Haegele provided an analysis of that period. Haegele's analysis relied on statements made in

Debtor's Plan and Disclosure Statement, filings in this case and in the state court foreclosure case, including the receiver's reports. That analysis assumed that KJ Lodico's salary would be $40,000 per year, and that a third-party property manager would cost $5,000 per month, that the cost to make an unoccupied unit ready to rent would be $1,200 per unit, and that in each building the most expensive units in each building would be rented first. Haegele used a 90% occupancy rate for his report because historically, even when Debtor achieved higher than a 90% occupancy rate, it had enough delinquencies that the rate of occupied and paying units was never over 88%.

Simultaneous with the Bank's motion to lift the automatic stay, Debtor moved for Bankruptcy Rule 2004 examinations of Connie Saiger, John Frale, Robert Markay, and the firm of Kolnicki, Person and Wirth LLC, the individuals allegedly involved in the asserted frauds against Debtor. Robert Markay has since filed for bankruptcy individually, and the motion for his Rule 2004 examination was withdrawn. As to the others, the motion was denied because an adversary proceeding was filed here, (13ap1328) and any necessary discovery should take place in that proceeding.

Additional findings of fact appear in the following Conclusions of Law.

## CONCLUSIONS OF LAW

### Jurisdiction

Jurisdiction lies over this objection to proof of claim under 28 U.S.C. § 1334 and is referred here by Internal Procedure 15(a) of the District Court for the Northern District of Illinois. This matter is a motion to modify the automatic stay and is therefore a core proceeding under 28 U.S.C. § 157(b)(2)(G). A motion to modify the automatic stay "stems from the bankruptcy itself," and may constitutionally be decided by a bankruptcy judge. *Stern v. Marshall*, 131 S.Ct. 2594, 2618 (2011).

### Relief from Stay

Section 362(a) of the Bankruptcy Code provides for an automatic stay against "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor . . ." § 362(a)(1). Section 362(d) provides,

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of this section if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization.

§ 362(d).

The decision to modify the automatic stay pursuant to 11 U.S.C. § 362(d) is committed to the sound discretion of the bankruptcy court. *In re C & S Grain Co.*, 47 F.3d 233, 238 (7th Cir.1995).

The parties have stipulated that Debtor holds no equity in the real estate. Thus, as the party opposing such relief, Debtor has the burden of proof on all factual issues in this proceeding. § 362(g)(2). In order to prevail, Debtor must show that there is "a reasonable possibility of a successful reorganization within a reasonable time." *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 376 (1998). Confirmation in a Chapter 11 case cannot be approved unless the bankruptcy judge make a specific finding that the proposed plan is feasible. *Financial Sec. Assur. v. T–H New Orleans Ltd. Pshp. (In re T–H New Orleans Ltd. Pshp.)*, 116 F.3d 790, 801 (5th Cir.1997). "There is a sliding scale as to the extent to which a debtor must prove the possibility of an effective reorganization in a lift stay proceeding depending on the stage of the case." *In re Caldwell's Corners Partnership*, 174 B.R. 744, 759 (Bankr. N.D. Ill. 1994) (citing *Timbers*, 484 U.S. at 376). A debtor should have more leeway in the initial stages of a chapter 11 proceeding, less as the case progresses. *Id.*

To confirm a plan over objection of an impaired class of creditors, the plan must be fair and equitable with respect to that class. A plan is fair and equitable to classes of secured claims if the holders of such claims retain a lien to the extent of the amount of such claim and are paid deferred cash payments equal to the present value of such claims. § 1129(b)(2)(A)(i). If a creditor is to receive payments over time, the present value of the claims to be paid must include the amount of its allowed claim, plus an appropriate rate of interest to compensate the creditor for risk over time as to those deferred payments. *Rake v. Wade*, 508 U.S. 464, 472 (1993); *United Sav. Ass'n v. Timbers of Inwood Forest, Assocs.,*

*Ltd.*, 484 U.S. 365, 377, (1988). In computing the present value of the deferred payments, each deferred payment is reduced to its present value by factoring in the discount rate (interest rate) and timing of the payments. Section 1129(b)(2)(A)(i) is satisfied when the sum of the present value of each deferred payment equals the allowed secured claim.

The Bank argues that Debtor's plan is not feasible because it is not fair and equitable for failing to provide the Bank a sufficient interest rate, and because payments are not sufficient even to cover the interest required, causing Debtor's debt to increase over the thirty-year life of the proposed Plan. Further, the Bank argues that Debtor's Plan is not feasible because the properties that came from the Bank of Commerce are incapable of generating enough cashflow to pay for operations, supply working capital for future maintenance, and also pay debt service to the Bank.

Debtor maintains that to defeat a motion for relief from stay, it only has to show a "reasonable possibility" that it can reorganize, citing *In re SSK Partners LLC,* No. 11 bk 49091, 2012 WL 4929019, 2012 Bankr. LEXIS 4896, at *10-11 (Bankr. N.D. Ill. Oct. 12, 2012). The Bank argues that *SSK* does not apply because here, unlike in *SSK*, Debtor has filed a Plan under court order. In oral argument, the Bank's counsel argued that it would be unfair to allow Debtor to change its Plan throughout the course of the hearing. However, should this case proceed to plan confirmation, Debtor will not have to confirm its initial filed Plan because it would likely have an opportunity to amend the Plan under § 1127(a). Debtor was ordered to file a Plan to sharpen the issues for this hearing, not to bind Debtor to terms of its initial Plan.

While plans change, whether a debtor has ability to generate needed cashflow from its operations is another issue. Thus, the question of feasibility is not whether a particular plan proposes to pay enough to creditors, but whether Debtor can generate enough cashflow to propose any confirmable plan. Allowing Debtor to change some terms of the plan throughout the hearing does not unfairly force the Bank to shoot at a moving target because the Debtor cannot thereby change likely cashflow.

In assessing feasibility, a bankruptcy judge must make an "*informed judgment which embraces all facts relevant to future earning capacity and hence to present worth,* including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance." *In re Potter Material Serv., Inc.*, 781 F.2d 99, 104 (7th Cir. 1986) (quoting *Consolidated Rock Products v. Du Bois*, 312 U.S. 510 (1941) (emphasis in the

original) (overruled on other grounds recognized by *Kham & Nate's Shoes No. 2 Inc v. First Bank of Whiting*, 908 F.2d 1351, 1362-63 (7th Cir. 1990)). "The feasibility requirement mandates that the plan proponent offer concrete evidence of sufficient cash flow to fund and maintain both its operations and its obligations under the plan." *Coones v. Mut. Life Ins. Co. of NY*, 168 B.R. 247, 255 (D. Wyo. 1994).

The issue of feasibility raises two ultimate questions: (1) How much payment would the Bank be entitled to? and (2) How much net cash flow can Debtor generate before debt service?

**The Proper Interest Rate after an § 1111(b)(2) Election**

Because the Bank will not vote in favor of the Plan, section 1129(b)(2)(A)(i)(I) is applicable. The Bank argues that the interest rate should be 10.75% based on its expert's testimony. The Bank's expert testified that there was no rate at which Debtor would be able to finance the Bank of Commerce properties on the open market. Therefore, Haegele started with the current prime rate of 3.25%, and adjusted it upward 3.75 points for the thirty-year plan duration and the non-amortization feature, plus 1.75 points to account for the high loan to value ratio, and 2 more points for risks associated with the Debtor and the properties, to arrive at an interest rate of 10.75%. The plurality opinion in *Till* suggests that an interest rate adjustment between 1 and 3 points above prime is generally appropriate. *Till v. SCS Credit Corp.*, 541 U.S. 465, 480 (2004). An opinion in this court has approved the use of *Till's* plurality's formula approach for determining the interest rate in Chapter 11 when there is no readily determinable market rate of interest. *In re Mayslake Village–Plainfield Campus, Inc.* 441 B.R. 309 (Bankr. N.D. Ill. 2010). If the *Till* formula approach is used here, an adjustment of at least 3 points is appropriate because of the factors described by Haegele.

Debtor argues that under *Till*, 5% would be appropriate as a 1.75 point upward adjustment to the current prime rate, but did not provide evidence showing why a 1.75 point adjustment would be appropriate.

Debtor also argues that because the Bank has made an § 1111(b)(2) election, it is not even entitled to the *Till* rate as a matter of law. Section 1111(b)(2) allows an undersecured creditor to elect to have its entire claim treated as secured despite the operation of § 506(a) which would normally split its claim into a secured and unsecured portions. As a result of the claim being treated as completely secured, confirmation of the plan under cramdown provisions (required here, since the Bank has indicated that it will not vote in favor of the

plan) requires "that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan of at least the value of such holder's interest in such property." §1129(b)(2)(A)(i)(II). Thus, a secured creditor is entitled to payments with "a present value, determined as of the effective date of the plan, of at least the value of the claimant's interest in its collateral." *See* 7 Collier on Bankruptcy ¶ 1111.03[6]. Accordingly, payments under a plan must satisfy two requirements: (1) payment of the simple, arithmetic total of the stream of payments totaling at least equal the total claim, and (2) a stream of payments with a present value equal to the value of the collateral. *In re Bloomingdale Partners*, 155 B.R.961, 974 (Bankr. N.D. Ill. 1993).

Debtor argues that its proposal to pay $12,000 per month over thirty years satisfies both requirements for cramdown required for a §1111(b)(2) electing creditor because the payments "do double duty," satisfying the present value of the value of collateral, and nominal amount of the allowed claim. *Id.* The same stream of payments might in some cases operate to satisfy both requirements. However, Debtor's argument does not demonstrate or take into account what discount rate is appropriate, and instead assumes that the stream of payments would satisfy both requirements because "the application of § 1111(b) requires that the present value of such a note to equal only the value of the creditor's collateral, the solution lies in a below-market rate of interest," *Gen. Elec. Credit Equities, Inc. v. Brice Rd. Devs., LLC, (In re Brice Rd. Devs., LLC)*, 392 B.R. 274, 287 (B.A.P. 6th Cir. 2008). But that argument takes the *Brice Rd.* opinion out of its context. The issue in *Brice Rd.* was a plan provision allowing the debtor to cash out a § 1111(b) electing creditor in full before the end of the plan, which would have potentially resulted in the total of all payments failing to reach the nominal amount of the allowed claim. *Id* at 286. The below-market interest rate note involved in *Brice Rd.* would have "a face amount of the electing creditor's allowed claim" in order to protect the creditor's right to a stream of payments equal in its arithmetic total to the allowed claim. *Id* at 287. The stream of payments from the note (with a below market rate on the face amount) would still have had to constitute a present value of the value of the collateral.

The stream of payments proffered by the Debtor's proposed plan would be insufficient even if the discount rate were only 5%. The stream of payments in Debtor's filed plan of $12,000 per month over 360 months plus a final payment of $783,326 does add up to $5,103,326 using simple arithmetic, satisfying the first requirement under § 1111(b).

Debtor therefore assumes that 5% is an appropriate rate to pay the Bank under the plan. However, at a discount rate of 5%, the $12,000 per month over thirty years discounted to present value would be $2,235,379. *See* Appendix D for the calculation. Debtor would therefore be $485,621 short in present value in meeting the present value requirement. The $783,326 balloon payment thirty years in the future is insufficient because $783,326 thirty years in the future is worth $175,329.19 in the present at a 5% discount rate. *See* Appendix D. Paying $485,621 in present value thirty years in the future would require $2,169,629. *See* Appendix D. The picture is worse for Debtor's plan if the more likely 6.25% rate of interest is assumed.

While under *Till*, an adjustment of 1 to 3 points over prime is usually appropriate, *Till v. SCS Credit Corp.*, 541 U.S. 465, 480 (2004), Debtor's counsel offers no evidence showing why its adjustment of only 1.75 points over prime would be appropriate. It is not necessary to decide whether a greater adjustment than 3 points under *Till* is appropriate because as is shown below, even with a 3-point upward adjustment from the prime rate, Debtor will not be able to generate sufficient cashflow.

**Projection of Debtor's Cashflow**

**The Ramp-Up Period**

Attached as Appendix A is a projection of cash flows for the first year after confirmation. It is based on Appendix C to Mr. Haegele's expert report, with changes made to adjust for circumstances that were testified to at trial, with all plausible inferences made in Debtor's favor. As with Haegele's report, it assumes that the most expensive units would be rented first up to 90% occupancy, but accomplishes the ramp-up by Month 6 instead of Month 8. A six-month ramp up period was chosen because there is credible evidence that it is achievable. Debtor's plan of reorganization provides a six to twelve month period to ramp up. In Debtor's case in chief, KJ Lodico testified that it would be possible to ramp up in three to six months. In cross examination, she testified that the plan was a conservative estimate of what was possible, and that a three-to-six month ramp up period may be achievable. In Debtor's rebuttal case, KJ Lodico testified that a one-to-three month ramp up was possible, but on cross examination, KJ Lodico testified that a one-to-three month ramp up period was only what she "hoped" to be able to achieve. Thus, a one-to-three month ramp up period is speculative.

Where Debtor has offered evidence to show reduced expenses, those have been adjusted as indicated. Debtor's projections of repairs and maintenance in Debtor's Exhibit

24 are rejected because they are not related to the actual cost of repairs in any previous year. Debtor's Exhibit 24 shows repairs and maintenance of $67,004 for 2009, $67,743 for 2010, and $49,379 for 2011, but projects only $30,000 per year into the future. KJ Lodico testified that Debtor can rely on volunteer labor and charitable contributions from suppliers, but admitted on cross examination that Debtor's expenses in previous years' were reduced by such contributions. Instead, in this opinion, repairs and maintenance are projected by annualizing Debtor's summary of the receiver's actual expenses for repairs in Debtor's Exhibit 16.

The cost of utilities used here is Debtor's projected totals for gas, electric, water/sewer, and Trash in Debtor's Exhibit 24. As to the cost to bring a property to rentable condition, the low end of Lodico's testimony of the worst-case scenario was used. She has not been inside the properties for a long time, and some of these properties have been empty for months. However, the receiver's last report for September, 2013 suggests an optimistic estimate of what the worst needs may be, and that is an average of about $600 to ready each unit to be rented. The cost to have a property manager is 10% of collected rents, consistent with the testimony of KJ Lodico. Taxes, insurance, and association fees are taken unchanged from Haegele's report.

As Net Cashflow is shown in Appendix A, Debtor could be cashflow positive before debt service from Month 1. Over the first twelve months, Debtor is projected to have $182,291 in net cashflow before debt service.

**The Next Twenty-Nine Years**

Debtor's average net cashflow of Month 7 to Month 12, including income from the five DuPage Properties, is (before debt service) $16,588.92 per month. The final six months of the first year are an appropriate baseline for projecting future years because by Month 7, Debtor will have achieved the target occupancy rate and ramp up expenses would no longer be an issue. The Debtor could start making semi-annual property tax payments during that period. In Appendix A, a semi-annual property tax payment is shown at Month 10. The monthly average projected net cashflow of $16,588.92 reflects the need to make the semi-annual tax payments. Neither party has introduced evidence as to how income and expenses are expected to change over the next thirty years. KJ Lodico testified that in her experience, expenses and income generally rise together.

**Debtor Lacks Sufficient Cashflow**

Interest on $2,721,000 (the present value and secured debt) at 6.25% would be $14,171.88 per month. In order to pay the secured property value of $2,721,000 down to $800,000 at 6.25% over thirty years, Debtor would have to pay $15,994.59 per month. *See* Appendix B for the calculation. Paying down the secured debt to $800,000 was chosen because Debtor proposed during argument to pay down the debt to that figure. If that could be done, a balloon payment of $800,000 after thirty years would not render a plan unfeasible because if the secured debt were reduced that far, there would be enough equity to allow a refinancing.

Debtor proposes to pay the March 2014 property tax payment of $57,084 in quarterly installments over five years, which would average $951.40 per month over the first five years. Thus, paying the tax arrearage along with debt service to amortize the debt to $800,000 over thirty years at 6.25% interest would result in a shortfall of $357.07 per month during that five year period:

| | | |
|---|---|---|
| | $ 16,588.92 | Monthly Net Cashflow (Appendix A) |
| – | $ 951.40 | Monthly Property Tax Arrearage Paid in Plan |
| – | $ 15,994.59 | Monthly Debt Service (Appendix B) |
| | $ (357.07) | |

Nor would Debtor save enough money to create a cash reserve to pay for any capital improvement costs that are sure to arise over a thirty-year period. Even after the five years of tax installment payments were made under the plan, there would only be $594.33 per month surplus after debt service, not enough to build any significant cash reserve:

| | | |
|---|---|---|
| | $ 16,588.92 | Monthly Net Cashflow (Appendix A) |
| – | $ 15,994.59 | Monthly Debt Service (Appendix B) |
| | $ 594.33 | |

Debtor proposes not to pay debt service to the Bank over the course of the first year. Debtor could thereby accumulate $138,291 cash reserve from net cash flow. However, in order to provide a stream of payments with net present value of $2,721,000, interest due would have to accrue over the first year while no debt service would be paid. At 6.25% interest compounded monthly, Debtor would have to repay $2,896,019.66, and amortizing that amount to reduce the secured debt to a balance of $800,000 over the remaining twenty-nine years. That would require payments of $17,225.24 per month. *See* Appendix C for the calculations. Debtor's net cashflow of $16,588.92 from would therefore be insufficient to pay the necessary debt service.

As discussed above, Debtor proposes to pay taxes that have already accrued but are not yet due through the plan over the first five years. After the tax arrearage is paid, Debtor will not be able to cover debt service during that five year period:

| | | |
|---|---|---|
| | $ 16,588.92 | Monthly Net Cashflow (Appendix A) |
| – | $ 951.40 | Monthly Property Tax Arrearage Paid in Plan |
| – | $ 17,225.24 | Monthly Debt Service (Appendix C) |
| | $ (1,587.72) | |

Even if the tax arrearage from not making the March, 2014 tax payment can be paid over the first five years, new property tax payments will still come due semi-annually. Even after the arrearage has been paid off, Debtor will be cashflow negative after paying those taxes (as already reflected in the Monthly Net Cashflow from Appendix A) and debt service:

| | | |
|---|---|---|
| | $ 16,588.92 | Monthly Net Cashflow (Appendix A) |
| – | $ 17,225.24 | Monthly Debt Service (Appendix C) |
| | $ (636.32) | |

Moreover, there is no net cash flow after debt service that can accrue to take care of the likely need for large capital improvements over thirty years. Thus, Debtor's plan is speculative, not presently feasible.

**Debtor's Objection to the Bank's Proof of Claim**

Debtor attempted to proffer testimony from KJ Lodico regarding the facts underlying Debtor's objection and counterclaim to the Bank's proof of claim. That testimony was excluded because, under Circuit authority, "[h]earings to determine whether the stay should be lifted are meant to be summary in character." *Matter of Vitreous Steel Products Co.* 911 F.2d 1223, 1232 (7th Cir. 1990). A stay hearing is not "the appropriate time at which to bring in other issues, such as counterclaims against the creditor on largely unrelated matters. Such counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be." *Id.* (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 344 (1977), U.S.Code Cong. & Admin.News, 1978, pp. 5787, 6300). Thus, it was not appropriate to decide issues brought up in Debtor's objection to Proof of Claim No. 12 (filed as an adversary proceeding, 13-ap-1328).

Debtor's adversary complaint filed as counter claim to the Bank's claim seeks an unspecified amount of damages, including punitive damages, subordination of the Bank's claim, and avoidance or recision of the Bank's mortgage on the Washington-Taylor Property. If Debtor were to prevail in that litigation, the Bank's claim for debt might be greatly reduced (thereby changing the cashflow picture) or the Bank may find itself without

a security interest in the Washington-Taylor Property and thus unable to move to lift the automatic stay as to that property. Those issues are properly litigated in the Adversary Proceeding and not in the context of a motion to lift the automatic stay. But that does not mean that they should not be considered at this stage of proceedings. Rather, the possibility that Debtor may prevail in the adversary proceeding could mean that Debtor might still be able to propose a feasible plan of reorganization, but only if it prevails in the adversary proceeding.

There is authority for a bankruptcy judge to enter final judgment on Debtor's objection and counterclaim to the Bank's proof of claim. The question of whether a bankruptcy judge has constitutional authority to enter final judgment depends on "whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern v. Marshall*, 131 S. Ct. 2594, 2618 (2011). A bankruptcy judge did not have constitutional authority to decide the counterclaim in *Stern* because the determination of that counterclaim required "several factual and legal determinations that were not 'disposed of in passing on objections' to Pierce's proof of claim. . ." *Id.* at 2617. Here, Debtor's adversary proceeding related to this case presents an objection to the proof of claim itself. Code Section 502(b) provides that the court "shall determine the amount of such claim . . . except to the extent that (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for any reason . . ." If, as a Seventh Circuit opinion has explained, a bankruptcy judge has constitutional authority to enter final judgment on "preference-recovery and fraudulent-conveyance claims by the Trustee" when that is necessary under § 502(d), *Peterson v. Somers Dublin Ltd.*, 729 F.3d 741, 747 (2013), then the bankruptcy judge also has authority to enter final judgment on an objection to the proof of claim itself under § 502(b)(1). And of course that is "necessary" here under the *Stern* rationale.

**Adequate Protection**

Adequate protection is intended "only to assure that a secured creditor, during the pendency of a bankruptcy case, does not suffer a loss in the value of its interest in the property of the bankruptcy estate." *In re Markus Gurnee P'ship*, 252 B.R. 712, 716 (Bankr. N.D. Ill. 1997) (citing *United Sav. Ass'n v. Timbers of Inwood* Forest Assocs., Ltd., 484 U.S. 365 (1988)).

If the value of a secured creditor's interest is not declining during the bankruptcy case, then the creditor may not be entitled to adequate protection or stay relief under

§ 362(d)(1). *Id. See also In re Am. Consol. Transp. Cos.,* 09 bk 26062, 2010 WL 3655485, 2010 Bankr. LEXIS 3144, *9-10 (Bankr. N.D. Ill. Sept. 10, 2010) ("If a creditor's interest in the debtor's property is not declining in value, the creditor is not entitled to adequate protection."). Further, in order to be entitled to adequate protection, the Bank "must first prove the value of its collateral is declining." *In re M.D. Moody & Sons, Inc.*, 2010 Bankr. LEXIS 5220, 23-24 (Bankr. M.D. Fla. Mar. 5, 2010). Only after that initial showing, would the burden shift to Debtor to show that the Bank is adequately protected. *Id.* An under-secured creditor does not lack adequate protection merely by reason of being under-secured or by reason of not receiving post-petition interest. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 374-376 (1988).

Here, it has not been shown that the secured value of the Bank's interest is declining. Therefore the Bank is now adequately protected, and is not presently entitled to relief from the automatic stay for lack of adequate protection, and that condition appears likely to remain until the adversary proceeding is litigated.

## CONCLUSION

Debtor has not shown that it has enough cashflow to propose a feasible plan of reorganization unless it wins its suit against the Bank. The issues involved in the Adversary Proceeding were excluded from this hearing under *Vitreous Steel,* and therefore still need to be decided. Therefore, the automatic stay shall remain in effect until those issues are decided.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 16th day of January 2014

Appendix A

This Appendix makes a great deal more sense if pages A1 and A2 are set facing each other and taped at the arrows.

**tape →**

| | No. of Units | Rent Per Unit | Current | Month 1 Occupied Units | Month 1 Rent | Month 2 Occupied Units | Month 2 Rent | Month 3 Occupied Units | Month 3 Rent | Month 4 Occupied Units | Month 4 Rent | Month 5 Occupied Units | Month 5 Rent | Month 6 Occupied Units | Month 6 Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3853 S. Clinton | 1 | 1,200 | | 1 | 1,200 | 1 | 1,200 | 1 | 1,200 | 1 | 1,200 | 1 | 1,200 | 1 | 1,200 |
| 1111 N. Harlem | 1 | 640 | 1 | 1 | 640 | 1 | 640 | 1 | 640 | 1 | 640 | 1 | 640 | 1 | 640 |
| 1518 N. Harlem | 1 | 950 | 1 | 1 | 950 | 1 | 950 | 1 | 950 | 1 | 950 | 1 | 950 | 1 | 950 |
| 1915 S. Harlem | 6 | 840 | 2 | 2 | 1,680 | 2 | 1,680 | 2 | 1,680 | 3 | 2,520 | 4 | 3,360 | 6 | 5,040 |
| 1921 S. Harlem | 6 | 840 | 2 | 2 | 1,680 | 2 | 1,680 | 2 | 1,680 | 3 | 2,520 | 6 | 5,040 | 6 | 5,040 |
| 7121 W 34th | 6 | 855 | 3 | 6 | 5,130 | 6 | 5,130 | 6 | 5,130 | 6 | 5,130 | 6 | 5,130 | 6 | 5,130 |
| 6631-35 W 23rd | 10 | 743 | 1 | 1 | 743 | 1 | 743 | 1 | 743 | 1 | 743 | 2 | 1,486 | 5 | 3,715 |
| 2306 S 17th Ave | 5 | 846 | | | 0 | 0 | 0 | 2 | 1,692 | 5 | 4,230 | 5 | 4,230 | 5 | 4,230 |
| Washington-Taylor | 13 | 855 | 3 | 5 | 4,275 | 10 | 8,550 | 13 | 11,115 | 13 | 11,115 | 13 | 11,115 | 13 | 11,115 |
| Total Revenue | 49 | | 13 | 19 | 16,298 | 24 | 20,573 | 29 | 24,830 | 34 | 29,048 | 39 | 33,151 | 44 | 37,060 |
| Percent Occupied | | | | | 39% | | 49% | | 59% | | 69% | | 80% | | 90% |

(Haegele's testimony, as modified for a 6-month ramp-up period)

**tape →**

| | Annual | Month 1 Units to prepare | Month 1 | Month 2 Units to prepare | Month 2 | Month 3 Units to prepare | Month 3 | Month 4 Units to prepare | Month 4 | Month 5 Units to prepare | Month 5 | Month 6 Units to prepare | Month 6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Add'l Income from DuPage Properties | 44,000 | | 3,667 | | 3,667 | | 3,667 | | 3,667 | | 3,667 | | 3,667 |
| Taxes | 114,167 | | | | | | | | | | | | |
| Assoc. Fees | 5,364 | | (447) | | (447) | | (447) | | (447) | | (447) | | (447) |
| Utilities | 59,130 | | (4,928) | | (4,928) | | (4,928) | | (4,928) | | (4,928) | | (4,928) |
| Insurance | 21,910 | | (1,826) | | (1,826) | | (1,826) | | (1,826) | | (1,826) | | (1,826) |
| Repairs | 44,610 | | (3,718) | | (3,718) | | (3,718) | | (3,718) | | (3,718) | | (3,718) |
| Expense to Rent Units | 600 | 6 | (3,600) | 5 | (3,000) | 5 | (3,000) | 5 | (3,000) | 5 | (3,000) | 5 | (3,000) |
| Property Manager | | | (1,630) | | (2,057) | | (2,483) | | (2,905) | | (3,315) | | (3,706) |
| Total Expenses | (245,030) | | (16,148) | | (15,975) | | (16,401) | | (16,823) | | (17,233) | | (17,624) |
| **Net Cashflow** | **182,291** | | **3,817** | | **8,265** | | **12,096** | | **15,892** | | **19,585** | | **23,103** |

Dupage Properties: Based on KJ Lodico's testimony
Taxes: Unchanged from Haegele's Appendix C, except that the first tax payment in March may be paid through the plan
Association Fees & Insurance: Unchanged from Haegele's Appendix C
Utilities: Settlers Exhibit 24 10-yr projection for Gas, Electric, Water/Sewer, and Trash, summed together
Repairs: Settlers' summary of Receivers actual repair costs, annualized from 18 months. Settler's Exhibit 16
Expense to Rent: Based on KJ's testimony that it would cost $600-700 as a worst-case scenario
Property Manager: KJ's testimony that the property manager would be paid 10% of rent collected
Total expenses do not include any long-term capital costs that may have to be incurred,
such as likely need for new roof at the Washington-Taylor Property

**tape →**

Projection of Debtor's Cash Flow in Year 1

← tape

| Month 7 | | Month 8 | | Month 9 | | Month 10 | | Month 11 | | Month 12 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Occupied Units | Rent | Occupied Units | Rent | Occupied Units | Rent | Occupied Units | Rent | Occupied Units | Rent | Occupied Units | Rent | |
| 1 | 1,200 | 1 | 1,200 | 1 | 1,200 | 1 | 1,200 | 1 | 1,200 | 1 | 1,200 | 3853 S. Clinton |
| 1 | 640 | 1 | 640 | 1 | 640 | 1 | 640 | 1 | 640 | 1 | 640 | 1111 N. Harlem |
| 1 | 950 | 1 | 950 | 1 | 950 | 1 | 950 | 1 | 950 | 1 | 950 | 1518 N. Harlem |
| 6 | 5,040 | 6 | 5,040 | 6 | 5,040 | 6 | 5,040 | 6 | 5,040 | 6 | 5,040 | 1915 S. Harlem |
| 6 | 5,040 | 6 | 5,040 | 6 | 5,040 | 6 | 5,040 | 6 | 5,040 | 6 | 5,040 | 1921 S. Harlem |
| 6 | 5,130 | 6 | 5,130 | 6 | 5,130 | 6 | 5,130 | 6 | 5,130 | 6 | 5,130 | 7121 W 34th |
| 5 | 3,715 | 5 | 3,715 | 5 | 3,715 | 5 | 3,715 | 5 | 3,715 | 5 | 3,715 | 6631-35 W 23rd |
| 5 | 4,230 | 5 | 4,230 | 5 | 4,230 | 5 | 4,230 | 5 | 4,230 | 5 | 4,230 | 2306 S 17th Ave |
| 13 | 11,115 | 13 | 11,115 | 13 | 11,115 | 13 | 11,115 | 13 | 11,115 | 13 | 11,115 | Washington-Taylor |
| 44 | 37,060 | 44 | 37,060 | 44 | 37,060 | 44 | 37,060 | 44 | 37,060 | 44 | 37,060 | Total Revenue |
| | 90% | | 90% | | 90% | | 90% | | 90% | | 90% | |

← tape

| Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | |
|---|---|---|---|---|---|---|
| 3,667 | 3,667 | 3,667 | 3,667 | 3,667 | 3,667 | DuPage Properties |
| | | | (57,084) | | | Taxes |
| (447) | (447) | (447) | (447) | (447) | (447) | Assoc Fees |
| (4,928) | (4,928) | (4,928) | (4,928) | (4,928) | (4,928) | Utilities |
| (1,826) | (1,826) | (1,826) | (1,826) | (1,826) | (1,826) | Insurance |
| (3,718) | (3,718) | (3,718) | (3,718) | (3,718) | (3,718) | Repairs |
| | | | | | | Expense to Rent |
| (3,706) | (3,706) | (3,706) | (3,706) | (3,706) | (3,706) | Property Manager |
| (14,624) | (14,624) | (14,624) | (71,707) | (14,624) | (14,624) | Total Expenses |
| **26,103** | **26,103** | **26,103** | **(30,981)** | **26,103** | **26,103** | **Net Cashflow** |

Projected Net Cashflow, Months 7 - 12:
$99,533.50

Monthly Average Projected Net Cashflow, Months 7 - 12:
$16,588.92

← tape

Appendix B
Paydown to $800,000 at 6.25%

| | | | |
|---|---|---|---|
| Loan Amount | $ 2,721,000.00 | | $2,597,717.60 |
| Interest rate | 6.25% | | NPV(b2/12,c6:c366) |
| Months | 360 | | $123,282.40 |
| Payments | $15,994.59 | PMT(B2/12,B3,-B1, 800000) | PV(B2/12,360,,-800000) |

| Month | Beginning Balance | Payment | Rate | Interest | Principal | Ending Balance |
|---|---|---|---|---|---|---|
| J-14 | 2,721,000.00 | $15,994.59 | 6.25% | 14,171.88 | 1,822.72 | 2,719,177.28 |
| F-14 | 2,719,177.28 | 15,994.59 | 6.25% | 14,162.38 | 1,832.21 | 2,717,345.07 |
| M-14 | 2,717,345.07 | 15,994.59 | 6.25% | 14,152.84 | 1,841.76 | 2,715,503.31 |
| A-14 | 2,715,503.31 | 15,994.59 | 6.25% | 14,143.25 | 1,851.35 | 2,713,651.97 |
| M-14 | 2,713,651.97 | 15,994.59 | 6.25% | 14,133.60 | 1,860.99 | 2,711,790.98 |
| J-14 | 2,711,790.98 | 15,994.59 | 6.25% | 14,123.91 | 1,870.68 | 2,709,920.29 |
| J-14 | 2,709,920.29 | 15,994.59 | 6.25% | 14,114.17 | 1,880.43 | 2,708,039.87 |
| A-14 | 2,708,039.87 | 15,994.59 | 6.25% | 14,104.37 | 1,890.22 | 2,706,149.65 |
| S-14 | 2,706,149.65 | 15,994.59 | 6.25% | 14,094.53 | 1,900.06 | 2,704,249.58 |
| O-14 | 2,704,249.58 | 15,994.59 | 6.25% | 14,084.63 | 1,909.96 | 2,702,339.62 |
| N-14 | 2,702,339.62 | 15,994.59 | 6.25% | 14,074.69 | 1,919.91 | 2,700,419.71 |
| D-14 | 2,700,419.71 | 15,994.59 | 6.25% | 14,064.69 | 1,929.91 | 2,698,489.80 |
| J-15 | 2,698,489.80 | 15,994.59 | 6.25% | 14,054.63 | 1,939.96 | 2,696,549.85 |
| F-15 | 2,696,549.85 | 15,994.59 | 6.25% | 14,044.53 | 1,950.06 | 2,694,599.78 |
| M-15 | 2,694,599.78 | 15,994.59 | 6.25% | 14,034.37 | 1,960.22 | 2,692,639.56 |
| A-15 | 2,692,639.56 | 15,994.59 | 6.25% | 14,024.16 | 1,970.43 | 2,690,669.13 |
| M-15 | 2,690,669.13 | 15,994.59 | 6.25% | 14,013.90 | 1,980.69 | 2,688,688.44 |
| J-15 | 2,688,688.44 | 15,994.59 | 6.25% | 14,003.59 | 1,991.01 | 2,686,697.43 |
| J-15 | 2,686,697.43 | 15,994.59 | 6.25% | 13,993.22 | 2,001.38 | 2,684,696.05 |
| A-15 | 2,684,696.05 | 15,994.59 | 6.25% | 13,982.79 | 2,011.80 | 2,682,684.25 |
| S-15 | 2,682,684.25 | 15,994.59 | 6.25% | 13,972.31 | 2,022.28 | 2,680,661.97 |
| O-15 | 2,680,661.97 | 15,994.59 | 6.25% | 13,961.78 | 2,032.81 | 2,678,629.16 |
| N-15 | 2,678,629.16 | 15,994.59 | 6.25% | 13,951.19 | 2,043.40 | 2,676,585.76 |
| D-15 | 2,676,585.76 | 15,994.59 | 6.25% | 13,940.55 | 2,054.04 | 2,674,531.71 |
| J-16 | 2,674,531.71 | 15,994.59 | 6.25% | 13,929.85 | 2,064.74 | 2,672,466.97 |
| F-16 | 2,672,466.97 | 15,994.59 | 6.25% | 13,919.10 | 2,075.50 | 2,670,391.48 |
| M-16 | 2,670,391.48 | 15,994.59 | 6.25% | 13,908.29 | 2,086.31 | 2,668,305.17 |
| A-16 | 2,668,305.17 | 15,994.59 | 6.25% | 13,897.42 | 2,097.17 | 2,666,208.00 |
| M-16 | 2,666,208.00 | 15,994.59 | 6.25% | 13,886.50 | 2,108.09 | 2,664,099.91 |
| J-16 | 2,664,099.91 | 15,994.59 | 6.25% | 13,875.52 | 2,119.07 | 2,661,980.83 |
| J-16 | 2,661,980.83 | 15,994.59 | 6.25% | 13,864.48 | 2,130.11 | 2,659,850.72 |
| A-16 | 2,659,850.72 | 15,994.59 | 6.25% | 13,853.39 | 2,141.20 | 2,657,709.52 |
| S-16 | 2,657,709.52 | 15,994.59 | 6.25% | 13,842.24 | 2,152.36 | 2,655,557.16 |
| O-16 | 2,655,557.16 | 15,994.59 | 6.25% | 13,831.03 | 2,163.57 | 2,653,393.59 |
| N-16 | 2,653,393.59 | 15,994.59 | 6.25% | 13,819.76 | 2,174.84 | 2,651,218.76 |
| D-16 | 2,651,218.76 | 15,994.59 | 6.25% | 13,808.43 | 2,186.16 | 2,649,032.59 |
| J-17 | 2,649,032.59 | 15,994.59 | 6.25% | 13,797.04 | 2,197.55 | 2,646,835.04 |
| F-17 | 2,646,835.04 | 15,994.59 | 6.25% | 13,785.60 | 2,208.99 | 2,644,626.05 |
| M-17 | 2,644,626.05 | 15,994.59 | 6.25% | 13,774.09 | 2,220.50 | 2,642,405.55 |
| A-17 | 2,642,405.55 | 15,994.59 | 6.25% | 13,762.53 | 2,232.07 | 2,640,173.48 |

Appendix B
Paydown to $800,000 at 6.25%

| | | | | | | |
|---|---|---|---|---|---|---|
| N-40 | 1,206,820.77 | 15,994.59 | 6.25% | 6,285.52 | 9,709.07 | 1,197,111.70 |
| D-40 | 1,197,111.70 | 15,994.59 | 6.25% | 6,234.96 | 9,759.64 | 1,187,352.06 |
| J-41 | 1,187,352.06 | 15,994.59 | 6.25% | 6,184.13 | 9,810.47 | 1,177,541.59 |
| F-41 | 1,177,541.59 | 15,994.59 | 6.25% | 6,133.03 | 9,861.56 | 1,167,680.03 |
| M-41 | 1,167,680.03 | 15,994.59 | 6.25% | 6,081.67 | 9,912.93 | 1,157,767.10 |
| A-41 | 1,157,767.10 | 15,994.59 | 6.25% | 6,030.04 | 9,964.56 | 1,147,802.54 |
| M-41 | 1,147,802.54 | 15,994.59 | 6.25% | 5,978.14 | 10,016.46 | 1,137,786.09 |
| J-41 | 1,137,786.09 | 15,994.59 | 6.25% | 5,925.97 | 10,068.62 | 1,127,717.46 |
| J-41 | 1,127,717.46 | 15,994.59 | 6.25% | 5,873.53 | 10,121.07 | 1,117,596.39 |
| A-41 | 1,117,596.39 | 15,994.59 | 6.25% | 5,820.81 | 10,173.78 | 1,107,422.62 |
| S-41 | 1,107,422.62 | 15,994.59 | 6.25% | 5,767.83 | 10,226.77 | 1,097,195.85 |
| O-41 | 1,097,195.85 | 15,994.59 | 6.25% | 5,714.56 | 10,280.03 | 1,086,915.81 |
| N-41 | 1,086,915.81 | 15,994.59 | 6.25% | 5,661.02 | 10,333.57 | 1,076,582.24 |
| D-41 | 1,076,582.24 | 15,994.59 | 6.25% | 5,607.20 | 10,387.39 | 1,066,194.85 |
| J-42 | 1,066,194.85 | 15,994.59 | 6.25% | 5,553.10 | 10,441.50 | 1,055,753.35 |
| F-42 | 1,055,753.35 | 15,994.59 | 6.25% | 5,498.72 | 10,495.88 | 1,045,257.47 |
| M-42 | 1,045,257.47 | 15,994.59 | 6.25% | 5,444.05 | 10,550.54 | 1,034,706.93 |
| A-42 | 1,034,706.93 | 15,994.59 | 6.25% | 5,389.10 | 10,605.50 | 1,024,101.43 |
| M-42 | 1,024,101.43 | 15,994.59 | 6.25% | 5,333.86 | 10,660.73 | 1,013,440.70 |
| J-42 | 1,013,440.70 | 15,994.59 | 6.25% | 5,278.34 | 10,716.26 | 1,002,724.44 |
| J-42 | 1,002,724.44 | 15,994.59 | 6.25% | 5,222.52 | 10,772.07 | 991,952.37 |
| A-42 | 991,952.37 | 15,994.59 | 6.25% | 5,166.42 | 10,828.18 | 981,124.19 |
| S-42 | 981,124.19 | 15,994.59 | 6.25% | 5,110.02 | 10,884.57 | 970,239.62 |
| O-42 | 970,239.62 | 15,994.59 | 6.25% | 5,053.33 | 10,941.26 | 959,298.36 |
| N-42 | 959,298.36 | 15,994.59 | 6.25% | 4,996.35 | 10,998.25 | 948,300.11 |
| D-42 | 948,300.11 | 15,994.59 | 6.25% | 4,939.06 | 11,055.53 | 937,244.58 |
| J-43 | 937,244.58 | 15,994.59 | 6.25% | 4,881.48 | 11,113.11 | 926,131.47 |
| F-43 | 926,131.47 | 15,994.59 | 6.25% | 4,823.60 | 11,170.99 | 914,960.48 |
| M-43 | 914,960.48 | 15,994.59 | 6.25% | 4,765.42 | 11,229.17 | 903,731.30 |
| A-43 | 903,731.30 | 15,994.59 | 6.25% | 4,706.93 | 11,287.66 | 892,443.64 |
| M-43 | 892,443.64 | 15,994.59 | 6.25% | 4,648.14 | 11,346.45 | 881,097.19 |
| J-43 | 881,097.19 | 15,994.59 | 6.25% | 4,589.05 | 11,405.55 | 869,691.64 |
| J-43 | 869,691.64 | 15,994.59 | 6.25% | 4,529.64 | 11,464.95 | 858,226.69 |
| A-43 | 858,226.69 | 15,994.59 | 6.25% | 4,469.93 | 11,524.66 | 846,702.03 |
| S-43 | 846,702.03 | 15,994.59 | 6.25% | 4,409.91 | 11,584.69 | 835,117.34 |
| O-43 | 835,117.34 | 15,994.59 | 6.25% | 4,349.57 | 11,645.02 | 823,472.32 |
| N-43 | 823,472.32 | 15,994.59 | 6.25% | 4,288.92 | 11,705.68 | 811,766.64 |
| D-43 | 811,766.64 | 15,994.59 | 6.25% | 4,227.95 | 11,766.64 | **800,000.00** |
| Balloon | | $ 800,000.00 | | | | |

(Pages B2-B7 are ommited)

Appendix C

1 year with no debt service

| | | |
|---|---|---|
| Loan Amount | $ 2,721,000.00 | |
| Loan Amount after 1 year | $ 2,896,019.66 | FV(B3/12,12,0,-B1) |
| Interest rate | 6.25% | |
| Months | 348 | |
| Payments | $17,225.24 | PMT(B3/12,B4,-B2, 800000) |

| | Balance | Payment | Rate | Interest | Principal |
|---|---|---|---|---|---|
| J-15 | $ 2,896,019.66 | $17,225.24 | 6.25% | $ 15,083.44 | $2,141.80 |
| F-15 | $ 2,893,877.85 | $17,225.24 | 6.25% | $ 15,072.28 | $2,152.96 |
| M-15 | $ 2,891,724.89 | $17,225.24 | 6.25% | $ 15,061.07 | $2,164.17 |
| A-15 | $ 2,889,560.72 | $17,225.24 | 6.25% | $ 15,049.80 | $2,175.44 |
| M-15 | $ 2,887,385.28 | $17,225.24 | 6.25% | $ 15,038.46 | $2,186.78 |
| J-15 | $ 2,885,198.50 | $17,225.24 | 6.25% | $ 15,027.08 | $2,198.16 |
| J-15 | $ 2,883,000.34 | $17,225.24 | 6.25% | $ 15,015.63 | $2,209.61 |
| A-15 | $ 2,880,790.72 | $17,225.24 | 6.25% | $ 15,004.12 | $2,221.12 |
| S-15 | $ 2,878,569.60 | $17,225.24 | 6.25% | $ 14,992.55 | $2,232.69 |
| O-15 | $ 2,876,336.91 | $17,225.24 | 6.25% | $ 14,980.92 | $2,244.32 |
| N-15 | $ 2,874,092.59 | $17,225.24 | 6.25% | $ 14,969.23 | $2,256.01 |
| D-15 | $ 2,871,836.59 | $17,225.24 | 6.25% | $ 14,957.48 | $2,267.76 |
| J-16 | $ 2,869,568.83 | $17,225.24 | 6.25% | $ 14,945.67 | $2,279.57 |
| F-16 | $ 2,867,289.26 | $17,225.24 | 6.25% | $ 14,933.80 | $2,291.44 |
| M-16 | $ 2,864,997.82 | $17,225.24 | 6.25% | $ 14,921.86 | $2,303.38 |
| A-16 | $ 2,862,694.44 | $17,225.24 | 6.25% | $ 14,909.87 | $2,315.37 |
| M-16 | $ 2,860,379.07 | $17,225.24 | 6.25% | $ 14,897.81 | $2,327.43 |
| J-16 | $ 2,858,051.63 | $17,225.24 | 6.25% | $ 14,885.69 | $2,339.55 |
| J-16 | $ 2,855,712.08 | $17,225.24 | 6.25% | $ 14,873.50 | $2,351.74 |
| A-16 | $ 2,853,360.34 | $17,225.24 | 6.25% | $ 14,861.25 | $2,363.99 |
| S-16 | $ 2,850,996.35 | $17,225.24 | 6.25% | $ 14,848.94 | $2,376.30 |
| O-16 | $ 2,848,620.05 | $17,225.24 | 6.25% | $ 14,836.56 | $2,388.68 |
| N-16 | $ 2,846,231.37 | $17,225.24 | 6.25% | $ 14,824.12 | $2,401.12 |
| D-16 | $ 2,843,830.26 | $17,225.24 | 6.25% | $ 14,811.62 | $2,413.62 |
| J-17 | $ 2,841,416.63 | $17,225.24 | 6.25% | $ 14,799.04 | $2,426.20 |
| F-17 | $ 2,838,990.44 | $17,225.24 | 6.25% | $ 14,786.41 | $2,438.83 |
| M-17 | $ 2,836,551.61 | $17,225.24 | 6.25% | $ 14,773.71 | $2,451.53 |
| A-17 | $ 2,834,100.07 | $17,225.24 | 6.25% | $ 14,760.94 | $2,464.30 |
| M-17 | $ 2,831,635.77 | $17,225.24 | 6.25% | $ 14,748.10 | $2,477.14 |
| J-17 | $ 2,829,158.63 | $17,225.24 | 6.25% | $ 14,735.20 | $2,490.04 |
| J-17 | $ 2,826,668.59 | $17,225.24 | 6.25% | $ 14,722.23 | $2,503.01 |
| A-17 | $ 2,824,165.59 | $17,225.24 | 6.25% | $ 14,709.20 | $2,516.04 |
| S-17 | $ 2,821,649.54 | $17,225.24 | 6.25% | $ 14,696.09 | $2,529.15 |
| O-17 | $ 2,819,120.39 | $17,225.24 | 6.25% | $ 14,682.92 | $2,542.32 |
| N-17 | $ 2,816,578.07 | $17,225.24 | 6.25% | $ 14,669.68 | $2,555.56 |
| D-17 | $ 2,814,022.51 | $17,225.24 | 6.25% | $ 14,656.37 | $2,568.87 |
| J-18 | $ 2,811,453.64 | $17,225.24 | 6.25% | $ 14,642.99 | $2,582.25 |
| F-18 | $ 2,808,871.38 | $17,225.24 | 6.25% | $ 14,629.54 | $2,595.70 |
| M-18 | $ 2,806,275.68 | $17,225.24 | 6.25% | $ 14,616.02 | $2,609.22 |
| A-18 | $ 2,803,666.46 | $17,225.24 | 6.25% | $ 14,602.43 | $2,622.81 |

Appendix C

1 year with no debt service

| | | | | | |
|---|---|---|---|---|---|
| N-41 | $ 1,116,768.19 | $17,225.24 | 6.25% | $ 5,816.50 | $11,408.74 |
| D-41 | $ 1,105,359.46 | $17,225.24 | 6.25% | $ 5,757.08 | $11,468.16 |
| J-42 | $ 1,093,891.30 | $17,225.24 | 6.25% | $ 5,697.35 | $11,527.89 |
| F-42 | $ 1,082,363.41 | $17,225.24 | 6.25% | $ 5,637.31 | $11,587.93 |
| M-42 | $ 1,070,775.48 | $17,225.24 | 6.25% | $ 5,576.96 | $11,648.28 |
| A-42 | $ 1,059,127.19 | $17,225.24 | 6.25% | $ 5,516.29 | $11,708.95 |
| M-42 | $ 1,047,418.24 | $17,225.24 | 6.25% | $ 5,455.30 | $11,769.94 |
| J-42 | $ 1,035,648.30 | $17,225.24 | 6.25% | $ 5,394.00 | $11,831.24 |
| J-42 | $ 1,023,817.06 | $17,225.24 | 6.25% | $ 5,332.38 | $11,892.86 |
| A-42 | $ 1,011,924.20 | $17,225.24 | 6.25% | $ 5,270.44 | $11,954.80 |
| S-42 | $ 999,969.40 | $17,225.24 | 6.25% | $ 5,208.17 | $12,017.07 |
| O-42 | $ 987,952.34 | $17,225.24 | 6.25% | $ 5,145.59 | $12,079.65 |
| N-42 | $ 975,872.68 | $17,225.24 | 6.25% | $ 5,082.67 | $12,142.57 |
| D-42 | $ 963,730.11 | $17,225.24 | 6.25% | $ 5,019.43 | $12,205.81 |
| J-43 | $ 951,524.30 | $17,225.24 | 6.25% | $ 4,955.86 | $12,269.38 |
| F-43 | $ 939,254.92 | $17,225.24 | 6.25% | $ 4,891.95 | $12,333.29 |
| M-43 | $ 926,921.63 | $17,225.24 | 6.25% | $ 4,827.72 | $12,397.52 |
| A-43 | $ 914,524.11 | $17,225.24 | 6.25% | $ 4,763.15 | $12,462.09 |
| M-43 | $ 902,062.01 | $17,225.24 | 6.25% | $ 4,698.24 | $12,527.00 |
| J-43 | $ 889,535.01 | $17,225.24 | 6.25% | $ 4,632.99 | $12,592.25 |
| J-43 | $ 876,942.77 | $17,225.24 | 6.25% | $ 4,567.41 | $12,657.83 |
| A-43 | $ 864,284.94 | $17,225.24 | 6.25% | $ 4,501.48 | $12,723.76 |
| S-43 | $ 851,561.18 | $17,225.24 | 6.25% | $ 4,435.21 | $12,790.03 |
| O-43 | $ 838,771.15 | $17,225.24 | 6.25% | $ 4,368.60 | $12,856.64 |
| N-43 | $ 825,914.51 | $17,225.24 | 6.25% | $ 4,301.64 | $12,923.60 |
| D-43 | $ 812,990.91 | $17,225.24 | 6.25% | $ 4,234.33 | $12,990.91 |
| Balloon | | $ 800,000.00 | | | |

(Pages C2-C7 are ommited)

Appendix D

§ 1111(b)(2) Analysis, Calculated using Microsoft Excel

| | $12,000/m | | Full Amort (see Note below) | |
|---|---|---|---|---|
| Balance of Loan (disputed) | $ 5,103,326 | $ 5,103,326 | $ 5,103,326 | $ 5,103,326 |
| Value of Collateral | $ 2,721,000 | $ 2,721,000 | $ 2,721,000 | $ 2,721,000 |
| Plan Payment | $ 12,000 | $ 12,000 | $ 14,607 | $ 16,754 |
| Term (in months) | 360 | 360 | 360 | 360 |
| Interest Rate (assumed) | 5.00% | 6.25% | 5.00% | 6.25% |
| Present Value of Payments -PV([Interest Rate]/12,[Term],[Plan Payments]) | $ 2,235,379 | $ 1,948,947 | $ 2,721,000 | $ 2,721,000 |
| | | | | |
| Value of Collateral - Present Value of Payments | $ 485,621 | $ 772,053 | $ (0) | $ 0 |
| Adjusted to Future Value | $ 2,169,629 | $ 5,009,982 | $ (0) | $ 0 |

-FV([Interest Rate]/12,[Term],,[Value of Colalteral - Present Value of Payments])

For use of the "FV" formula, http://office.microsoft.com/en-us/excel-help/fv-function-HP010342545.aspx

| | | | | |
|---|---|---|---|---|
| Payment Stream (Plan Payment × Term) | $ 4,320,000 | $ 4,320,000 | $ 5,258,490 | $ 6,031,319 |
| Full Balance minus Payment Stream | $ 783,326 | $ 783,326 | $ (155,164) | $ (927,993) |

**Note:** Plan Payment amount for Full Amortization was arrived at with the forumla:

-PMT([Interest Rate]/12,[Term],[Value of Collateral])

For use of the "PMT" formula, see http://office.microsoft.com/en-us/excel-help/pmt-HP005209215.aspx

| | | |
|---|---|---|
| Present value of $783,326 in 30 years | $175,329.19 | $120,712.89 |

"PV([rate]/12,[months],,-783,326)"

For use of the "PV" formula, http://office.microsoft.com/en-us/excel-help/pv-HP005209225.aspx